Filed 1/31/25  In re X.A. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re X.A. et al., | B338604 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 22CCJP00758) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SARAH M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Davis, Judge.  Conditionally reversed and remanded with instructions.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant Sarah M.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Sarah M. (Mother) challenges the juvenile court's order under Welfare and Institutions Code[1] section 366.26 terminating her parental rights to minors X.A. (born 2019) and E.A. (born 2021) in favor of a plan involving a maternal relative adopting the children. Mother argues the juvenile court erred in finding the beneficial relationship exception to termination of her parental rights inapplicable. That exception applies when a parent shows all of the following three elements: (1) the parent has consistently visited with the child; (2) "the child has a substantial, positive, emotional attachment to the parent"; and (3) adoption would be detrimental to the child because the benefits the child enjoys from their relationship with the parent outweigh the stability and permanence of adoption. (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*); see § 366.26, subd. (c)(1)(B)(i).) Because Mother had the burden of proof below, her burden on appeal is to show that, as a matter of law, the facts compel the conclusion that she has proven all three elements. Because Mother has failed to make such a showing as to the second element, we must affirm. We need not and do not consider the remaining elements.

_____

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

2

We agree, however, with Mother and DCFS that DCFS and the child welfare agency in another county where the case originated failed to adequately inquire whether the children were "Indian children" as defined in the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). On this basis, we conditionally reverse the court's order terminating Mother's parental rights as well as those of Luis A. (Father).

## FACTUAL AND PROCEDURAL BACKGROUND

Father did not actively participate in the proceedings below and is not a party to this appeal. We confine our discussion of the factual and procedural background to the portions of it relevant to Mother's appeal.

### A. Proceedings in Kern County

On October 29, 2021, the Kern County Department of Human Services (KCDHS) filed a section 300 petition on behalf of X.A. and E.A. alleging that on October 27, 2021, Mother was found in a car intoxicated and passed out, slumped over in the passenger seat, with the children in the back seat unsecured. The car was at a stop light, running and in drive, with the driver also passed out. Mother was aware the driver had been drinking and there were open cans of alcohol within reach of X.A. KCDHS also alleged that Mother drank alcohol daily and her substance abuse placed the children at risk. KCDHS asserted claims under subdivision (b) of section 300 that Mother failed or was unable to supervise or protect the children adequately, Father willfully or negligently failed to supervise or protect the children adequately from Mother's conduct, and Mother and Father were both unable to provide regular care for the children due to their substance abuse.

3

The Kern County juvenile court detained the children on November 1, 2021. On January 10, 2022, the court found the allegations against Mother and Father true and asserted jurisdiction over the children.

On February 23, 2022, the court ordered the case transferred to Los Angeles County where Mother resided and where the children had been placed with maternal grandfather (MGF). In a report prepared for the transfer-out hearing, a KCDHS social worker stated that Mother had been regularly visiting the children.

**B.     The Los Angeles County Juvenile Court Accepts the Case and Proceeds to Disposition**

On March 9, 2022, the Los Angeles County juvenile court accepted the transfer. Mother reported that Father was incarcerated in Kern County. The children remained placed with MGF.

In a jurisdiction/disposition report filed on April 13, 2022, DCFS informed the court that Father's scheduled release date was in July 2022. According to Mother, she and Father separated when the dependency case initiated. Mother was participating in a substance abuse program. She had refused to take an alcohol/drug test on March 8, but had a negative drug test on March 26.

At the disposition hearing on April 26, 2022, counsel for DCFS and the minors contended the court should remove the children from Mother due to Mother's history of alcohol abuse. Mother requested the children be returned to her at MGF's home, pointing to her consistent compliance with services and programs. Based on the severity of the October 2021 incident, and the relatively short period Mother had been working to

4

achieve sobriety, the court declared the children dependents under section 300, and removed them from Mother and Father, finding by clear and convincing evidence that remaining in either parent's custody would pose a substantial danger and risk of detriment to the children, and that DCFS had made reasonable efforts to prevent removal. The court ordered DCFS to provide reunification services and visitation for Mother for a minimum of six hours per week. The court ordered Mother to participate in a drug/alcohol program and submit to weekly drug/alcohol testing.

## C. Family Reunification Period

In preparation for the section 366.21, subdivision (e) six-month review hearing, DCFS submitted reports informing the court that the children were placed in a foster home in mid-June. Mother visited the children each week on Wednesday and Saturday for three hours at a time. The monitors stated the visits were going well. Mother would bring snacks, activities, and games, and was attentive and playful with the children. X.A. was excited to visit with Mother and would constantly ask where Mother was, and at times would cry when the visits were ending and not cooperate in getting in the car to leave. When Mother redirected X.A. during visits, X.A. would become upset and hit Mother on her hands and face. E.A. did not become upset when the visits ended. Mother was observed to be patient and caring towards the children.

Mother tested positive for alcohol on June 21, 2022, and in July called a social worker to disclose that she had relapsed on three occasions. In August and September, Mother's alcohol/drug tests were all negative.

In last minute information for the court (LMI) reports filed on October 20 and 25, 2022, DCFS notified the court that Mother

5

was hospitalized on October 1 due to a fall. While at the hospital she was placed on an involuntary hold under section 5150, and she was released on October 13. Mother had felt overwhelmed and hopeless, was diagnosed with major depression, and was prescribed Zoloft. Mother was considering entering an inpatient program for depression, anxiety, and substance abuse.

The juvenile court held the six-month review hearing on October 25, 2022. Mother did not oppose continued court jurisdiction and placement of the children with the foster parents. The court found continued jurisdiction necessary and that returning the children to Mother's custody would create a substantial risk of detriment. The court ordered continued reunification services for Mother but terminated reunification services for Father.

In a December 22, 2022 filing, DCFS reported the children remained with the same foster family. X.A. stated she was "happy" living with the foster parents. Mother was participating in a drug/alcohol abuse program and was testing negative for drugs and alcohol. Mother's visitation had increased from two to three days per week, and she was consistent with visitation. The foster mother reported that the visits she monitored went well; Mother played with the children and attended to their needs, and the children appeared to be enjoying themselves. Social workers reported that the visits they monitored went well; Mother brought activities, such as games, paints, and toys, fed the children healthy meals, and was caring and attentive. The children appeared to be happy during visits. X.A. decreased in hitting Mother and being upset when leaving visits; she smiled and responded "yes" when asked if she liked seeing Mother.

At the permanency hearing on January 9, 2023, Mother did not oppose continued court jurisdiction and placement of the children with the foster parents.  The court found continued jurisdiction necessary and ordered continued reunification services.  The court liberalized Mother's visits to unmonitored day visits up to three hours.

In a concurrent planning assessment completed on January 23, 2023, DCFS recommended placing the children with maternal uncle Ruben D. and his wife Jessica R.[2] as legal guardians if Mother was unable to reunify.  The couple lived in Utah.  Ruben D. expressed an interest in being a legal guardian but not adopting the children.

On June 20, 2023, DCFS filed a status review report indicating that, according to the foster mother, Mother's visitation was inconsistent.  She would sometimes be late, failed to show up for three visits, and failed to timely confirm leading to four cancelled visits.  When Mother failed to attend a scheduled visit, X.A. would become upset and cry, and be easily agitated and physically aggressive for a couple of days.  Mother explained that she was working the swing shift and would sometimes oversleep.  A social worker attended two visits and observed Mother being attentive and caring towards the children, engaging in activities with the children, and being affectionate; the children appeared happy and excited to spend time with Mother and displayed affection towards her.  Mother did not support placing the children with any of her family members, stating she was estranged from them due to conflict, dysfunction,

---

[2] Jessica R. is also identified in the record as Jessica G.

and mental health.  Mother tested positive for alcohol three times in March and April 2023.

In a July 5, 2023 LMI report, DCFS notified the court that Mother had failed to comply with a request for a sample from her alcohol/drug abuse program on May 25, 2023, and had tested positive for alcohol at a high level on June 13, 2023.  Mother now wanted the children placed with Ruben D. and Jessica R. in Utah.  On July 6, the court ordered DCFS to initiate an interstate compact on the placement of children for placement with Ruben D.

At the section 366.22 permanency review hearing on August 14, 2023, Mother did not oppose termination of reunification services.  The court found continued jurisdiction necessary and terminated reunification services.  The court scheduled a section 366.26 hearing to select a permanent plan for the children.

**D.     The Permanency Plan Selection Hearing**

On November 28, 2023, DCFS filed a report in preparation for the permanency plan selection hearing.  Mother had monitored visits three times a week; according to the foster mother, the children appeared happy and excited to spend time with Mother and displayed affection towards Mother.  The children were having weekly video chats with Ruben D., Jessica R., and their two-year-old son, and according to the foster mother the chats were helping to build a relationship among them.

With its report, DCFS submitted concurrent planning assessments for the children completed in July 2023.  In those assessments, DCFS recommended adoption by Ruben D. and Jessica R.; the couple now wanted to adopt instead of being legal

guardians so that the children could "be raised together with family permanently with love and stability."

On January 23, 2024, DCFS filed a status review report in which it indicated that all licenses and approvals had been obtained to allow DCFS to move the children to Utah. Mother agreed with the plan for Ruben D. and Jessica R. to adopt the children. Mother continued to have monitored visits three times per week; she was observed to be attentive and caring towards the children, having planned activities, and bringing food and gifts; the children appeared happy and excited to spend time with Mother and displayed affection to her through hugs and kisses. During a visit to the foster home, a social worker observed X.A. refuse to speak to Mother on the phone and throw the phone. X.A.'s therapist noted that X.A. engaged in physical aggression and tantrums after visits with Mother.

On January 30, 2024, the court authorized DCFS to transport the children to Ruben D.'s and Jessica R.'s home in Utah. DCFS transported the children to Ruben D.'s and Jessica R.'s home on February 23, 2024.

On February 13, 2024, the court held a permanency planning review hearing. The court found continued jurisdiction necessary, and that adoption was the appropriate permanent plan. The court rescheduled the section 366.26 permanency plan selection hearing, which was eventually held on June 10, 2024.

E.    **Basic Legal Principles Governing the Beneficial Relationship Exception**

As we discuss below, at the permanency plan selection hearing Mother opposed termination of her parental rights based on the beneficial relationship exception. We provide a brief

9

overview of the exception here to assist in understanding the parties' arguments and the juvenile court's ruling.

" ' "At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care.  [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans." [Citation.]' [Citation.]" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316.)  If adoption is ordered, the court must terminate parental rights.  (*Ibid.*)

Section 366.26, subdivision (c) states several exceptions to this rule, among them the beneficial relationship exception, which applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . [¶] . . . [t]he parents hav[ing] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id.*, subd. (c)(1)(B)(i).)

In *Caden C.*, our Supreme Court held that a parent must prove three elements for the beneficial relationship exception to apply.  (*Caden C., supra*, 11 Cal.5th at p. 631.)  Specifically, a parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at p. 636.)

**F.    DCFS's Report in Preparation for the Permanency Selection Hearing**

On May 24, 2024, DCFS filed a supplemental report for the section 366.26 permanency plan selection hearing.  Mother had relocated to Utah in early March 2024 to be near the children and continue in-person visits.  Under an agreement with Ruben D. and Jessica R., Mother participated in family outings with them and the children during the week, and additionally visited with the children on Saturdays if her work schedule permitted. Jessica R. reported that Mother's participation in family outings was consistent.

DCFS stated in the report, "The children were [two and a half years] and [seven] months . . . old when they were detained from [Mother]'s custody.  The children were detained at an age where attachment to a parent/caregiver is typically established. [Mother] has continued to visit the children for the past [two and a half] years and has formed a relationship with the children. However, the relationship is not of a typically child-parent [*sic*] due to [Mother]'s lack of responsibilities, and having limited interactions with the children."  DCFS further stated, "[Mother] has been observed as becoming i[m]patient at times when the children do no[t] follow directions and become restless.  [Mother] continues to struggle with her own mental health and substance issues, individual needs, and triggers and lacks effective coping skills to be an active, healthy, and responsible parent."

Jessica R. reported that Mother was affectionate towards the children, and the children appeared happy and excited to receive gifts from Mother; however, Mother did not call the children to check how they were doing or ask to speak to them. In addition, Mother was 30 minutes late for visits which made

11

the children anxious. Sometimes at the end of the visits X.A. had difficulty detaching from Mother, but the situation was improving. X.A. had a history of struggling to regulate her emotions, but she had been receiving therapy to address this. The children did not ask to call or visit with Mother. A social worker asked X.A. about her visits with Mother and how she felt about Mother, and X.A. responded, "walk at the park, run around, I get toys, fun." Jessica R. reported that E.A. enjoyed visits with Mother and did not display any emotional upset at the end of the visits.

The children were adjusting well to living with Ruben D. and Jessica R., "developing a sense of stability, building trust, feel[ing] secure, and loved."

DCFS stated, "[Mother] has a history of mental health issues and alcoholism that put the safety and well-being of her young and vulnerable children at risk for serious injuries and death. [Mother] continues to struggle with mental health issues and alcoholism and never mitigated the issues in the longevity of the case. In recent conversations with family members in Utah, it is reported that [Mother] continues to consume alcohol, arrives to work smelling of alcohol, and was observed passed out with alcohol cans around her bed on [May 6, 20]24. [Mother] continues to lack insight as to her alcoholism and appears in denial of her substance abuse."

DCFS recommended the court terminate Mother's parental rights so that the children could be adopted.

## G. The Permanency Plan Selection Hearing

At the permanency plan selection hearing, counsel for DCFS and the children urged the court to follow DCFS's recommendation to select adoption and terminate Mother's

12

parental rights.  Mother opposed terminating her parental rights, contending the beneficial relationship exception applied.  Mother did not testify at the hearing or call any witnesses, relying instead on the various reports introduced by DCFS.  Mother's counsel argued, "I think that my client has demonstrated a bond, and she has fulfilled the role of a parent.  She's not just a play date, not just a friend.  The children know her as their mother."  In rebuttal, counsel for DCFS conceded that Mother had visited with the children consistently, but contended the detriment to the children from termination of Mother's parental rights was outweighed by the benefit of adoption.  DCFS's counsel noted that the children were detained from Mother at a young age, that Mother exhibited impatience at recent visits, and that Mother continued to struggle with alcohol abuse which would negatively impact the children.

The court found by clear and convincing evidence that it would be detrimental for the children to be returned to Mother, and that the children were adoptable.  The court concluded that Mother had not established the beneficial relationship exception, finding she had not maintained regular visitation with the children, had not established a substantial bond with the children, and that any benefit accruing to the children from their relationship with Mother was outweighed by the benefits of adoption.  The court stated,  "Ultimately [Mother] still continues to struggle with mental health issues and alcoholism and never has mitigated the issues in the longevity in this case.  She continue[s] to lack insight as to her alcoholism and appears to be in denial of her substance abuse.  The kids have been in their home for awhile[;] they're happy, comfortable, and secure, and they're making significant progress in the developmental

milestones and seem to be thriving in their new environment. For those reasons, the court finds it in the best interest of the children to leave them where they are." The court thus terminated the parental rights of Mother and Father and ordered that the permanent plan for the children was adoption.

## H. ICWA Compliance

KCDHS alleged in its petition that both Mother and Father denied the children might be Indian children under ICWA. Both Mother and Father filed documents with the Kern County juvenile court disclaiming any Native American heritage, and at the detention hearing the court found the children were not Indian children. The record does not disclose any additional efforts by KCDHS or the Kern County juvenile court to inquire whether the children might be Indian children.

While the case was pending in Los Angeles County juvenile court, DCFS repeatedly asked Mother whether she or the children had any Native American heritage, and Mother denied any such heritage. Nothing in the record indicates that DCFS or the juvenile court inquired of any extended family members whether the children might be Indian children.

At the permanency plan selection hearing, the court asked counsel whether "any other family members" had been identified who should be interviewed regarding the children possibly being Indian children, and counsel all responded they were unaware of any relatives that needed to be interviewed or reinterviewed. The court then found that ICWA did not apply.

## DISCUSSION

We first address Mother's contention the juvenile court erred in finding the beneficial relationship exception did not

apply.  We then turn to Mother's argument, and the concession by DCFS, that there was inadequate inquiry as to whether the children were Indian children under ICWA.

## A.    Standard of Review for the Beneficial Relationship Exception

For the beneficial relationship exception to apply, a parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  We review the first two elements or prongs of the test for substantial evidence and the third for an abuse of discretion.  (*Id.* at pp. 639-640.)

"The substantial evidence standard of review takes on a unique formulation where, as here, 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals.'  [Citations.] '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' [Citation.]  Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.)

15

**B. The Evidence Does Not Compel the Conclusion that the Children Had a Substantial, Positive, and Emotional Attachment to Mother**

We only address the second prong of the *Caden C.* test, as it is dispositive here.

To establish the second prong, a parent must show "something more than the incidental benefit a child gains from any amount of positive contact with [his or] her natural parent." (*In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 318.) "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Evidence that a parent is "a mere 'friendly visitor' " is insufficient. (See *In re Katherine J.*, *supra*, at p. 319.)

In determining whether a child has this specific type of beneficial, "substantial, positive, emotional attachment to the parent" that the parental benefit exception requires, courts consider that "the [parent-child] relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at pp. 632, 636.) In addition, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Id.* at p. 632.)

16

Although Mother points to evidence supporting a conclusion that she shares a positive emotional connection with her children, we cannot say the evidence *compels* a finding *as a matter of law* that the children's attachment to her was so substantial and of such a nature that it satisfies the second prong of the *Caden C.* test. The children had been detained from Mother at relatively young ages—X.A. was just over two years old and E.A. was seven months old. X.A. had spent more than half of her life, and E.A. most of her life, placed with others. Mother did not introduce any evidence of her relationship with the children before detention.

Rather, Mother relies on conclusory statements in DCFS reports that she and the children appeared to have "a family bond" or "a strong bond." The evidentiary facts reflected in these same DCFS reports are that, during their visits in the dependency case, Mother and the children enjoyed themselves, shared activities, and exhibited affection towards each other. For example, in May 2024, X.A. described her visits with Mother by stating, "walk at the park, run around, I get toys, fun." But such facts do not prevent a reasonable fact finder from concluding that the children do not have the specific type of substantial attachment to Mother that would satisfy the beneficial relationship test. To be sure, the reports suggest there is love and affection between Mother and her children. Particularly considering the record as a whole, however, the reports do not compel us to conclude Mother was more than "a mere 'friendly visitor' " with the children, or that Mother's relationship with the children benefitted them in a manner beyond "the incidental benefit a child gains from any amount of positive contact with

17

[his or] her natural parent." (*In re Katherine J.*, *supra*, 75 Cal.App.5th at pp. 318, 319.)

Mother argues that DCFS's report for the permanency plan selection hearing addressed several factors the Supreme Court disapproved of in *Caden C.*, including that Mother was not responsible for day-to-day custodial responsibilities and was not the primary caregiver for the children, Mother could not provide the children with permanency as could Ruben D. and Jessica R., Mother still struggled with her mental health and alcohol abuse, and Mother would be allowed contact with the children post-adoption.[3] This argument is unavailing, as there is no indication in the record that the court relied on any of these factors except for one on which the court could properly rely.[4] As to that factor—Mother's continuing struggles with mental health and alcohol abuse—the court's consideration of this evidence was proper under *Caden C.* because it was relevant to show that Mother's relationship with the children sometimes had a negative effect on them. (*Caden C.*, *supra*, 11 Cal.5th at p. 637 ["A

---

[3] DCFS's report repeatedly stated that the prospective adoptive parents were planning to allow Mother access to the children post-adoption. This information is irrelevant to the beneficial relationship analysis. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) At the permanency plan selection hearing, DCFS's counsel noted on the record that whether the prospective adoptive parents intended to continue to allow Mother access to the children was irrelevant and should not be considered, and there is no indication the court disregarded the law.

[4] The record does not support Mother's assertion that the juvenile court "adopted the DCFS analysis" and did not undertake its own analysis.

parent's continued struggles with the issues leading to dependency" may be properly considered if, for example, they show "that interaction between parent and child at least sometimes has a ' "negative" effect' on the child"].)

Mother further argues that the juvenile court failed to distinguish between Mother and Father in its ruling. Not so. The court's statements on the record expressly referenced Mother, and the court's minute order regarding the beneficial relationship exception necessarily related to Mother as she was the only parent relying on the exception.

Mother lastly argues that adoption offered "little benefit" to the children when compared with legal guardianship. This argument is relevant solely to the third factor in the *Caden C.* analysis, which we need not reach. Absent a finding of a substantial, positive parental attachment under the second prong, the statutory preference for adoption applies. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see § 366.26, subds. (b) & (c).) Because the evidence does not compel a finding that Mother and the children shared the type of substantial, emotional attachment that would satisfy the second prong of the *Caden C.* analysis, the court did not err in concluding the parental benefit exception did not apply.

## C. DCFS Failed to Comply with Its Duty to Inquire whether the Children were Indian Children

"Under ICWA's state analogue, the California Indian Child Welfare Act (Cal-ICWA; . . . § 224.2 et seq.), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases. (. . . § 224.2, subd. (a).) Child welfare agencies discharge this state law duty by 'asking the child,

parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' ([*Id*.], subd. (b).)" (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. omitted.)

Mother contends KCDHS and DCFS failed to comply with their duty of inquiry under Cal-ICWA because they relied entirely on the denials by Mother and Father regarding possible tribal affiliation, and did not interview any extended family members, several of whom attended hearings, had been contacted by the agencies, or were otherwise available. DCFS concedes it failed to comply fully with its duty of inquiry.

Based on the available record regarding the proceedings in Kern County, we agree with Mother that KCDHS failed to comply with its duty of inquiry under Cal-ICWA. We also agree, and accept DCFS's concession, that DCFS failed to comply with its duty of inquiry. Therefore, we must remand and direct the juvenile court to ensure DCFS makes proper and adequate further inquiry to conclude whether ICWA applies. Because we conditionally reverse the juvenile court's order terminating Mother's parental rights pending DCFS's and the juvenile court's compliance with ICWA and related state law, we also conditionally reverse the juvenile court's order terminating Father's parental rights. (See *In re A.L.* (2010) 190 Cal.App.4th 75, 80 ["with some exceptions, . . . a court may not terminate the parental rights of only one parent"]; Cal. Rules of Court, rule 5.725(a)(1).)

## DISPOSITION

The juvenile court's order terminating Mother's and Father's parental rights to the children X.A. and E.A. is conditionally reversed, and the case is remanded with instructions to ensure compliance with the inquiry requirement under ICWA and related California law.  If that inquiry reveals evidence of tribal affiliation, then the court is to ensure compliance with ICWA's corresponding notice requirements.  If it does not and the court finds DCFS has complied with its inquiry duties, the order terminating Mother's and Father's parental rights shall be reinstated forthwith.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

KLATCHKO, J.*

---

*Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21